CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
9/30/2023
LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
        DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

|  |  |
|---|---|
| ANIYA NICOLE HICKS, *et al.*, | |
| *Plaintiffs*, | Case No. 6:21-cv-00043 |
| v. | MEMORANDUM OPINION |
| CITY OF LYNCHBURG, *et al*., | |
| *Defendants*. | Judge Norman K. Moon |

The events at issue arise out of a series of violent fights between feuding high-school students that broke out throughout the River Ridge Mall in Lynchburg on March 7, 2020, and the ensuing police response. An "officer needs help" call issued, prompting additional officers' dispatch to the scene. Stores hastily pulled down their security gates—employees and customers temporarily locked inside and peering out at the melee. Crowds ran in all directions. Officers tried to clear everyone out, but many disregarded them. In the midst of this pandemonium, officers repeatedly commanded Plaintiff Aniya Hicks (then-14 years' old) to "get back" from an individual who was handcuffed and under arrest for fighting—her then-boyfriend. Plaintiff disregarded the orders, yelling she was going to stay right there.

When the officer tried to handcuff Plaintiff, she resisted, pulling back. Her friend tried to pull her away from the officer. Plaintiff and the officer had a physical altercation, leading to Plaintiff kicking and screaming on the ground. As Plaintiff was still resisting handcuffs, another officer assisted the first, using his arm to keep her down. That use of force lasted several seconds. When Plaintiff sat up, she had sustained a gash on her face, requiring stitches. An

1

officer immediately called a medic. As Plaintiff was at that time laying in the middle of the mall thoroughfare, another officer pulled her to the wall. Plaintiff says that officer moved her roughly and an unnecessary distance.

Plaintiff subsequently filed this suit under § 1983 against Defendants City of Lynchburg and Officers Lee Hughes, Nathan Godsie, and Hollie Breton. Noting fast-moving circumstances such as those at issue here require split-second decisions by officers, the Court concludes that Defendants' use of force was objectively reasonable, and in any event, they did not act contrary to clearly settled law. Defendants are entitled to qualified immunity on Plaintiff's excessive force claim. Plaintiff's other claims fail, including her *Monell* claim against the City of Lynchburg for allegedly inadequate training. The Court therefore will award summary judgment to Defendants.

<u>Background</u>

1. *Plaintiff's Account*

The plaintiff is Aniya Nicole Hicks. She was 14 years old on March 7, 2020—the date of the incident. Dkt. 30-1 ("Hicks Dep.") at 6. Plaintiff was at the indoor mall because it was a weekend night, and she was going to the movies. *Id.* at 7. Plaintiff and a friend were walking around the mall before the movie started and there were "a lot of people there," when Plaintiff saw "a fight that broke out between some girls first." *Id.* at 10–12.

Plaintiff's own words describe the scale of the fighting that broke out that night. Plaintiff remembered "the fight between the girls first," and "then the police were called." *Id.* at 12. Then, "in the middle of the girls fighting, the boys started fighting." *Id.* Plaintiff explained that "[i]t wasn't just like one or two girls. It was like a group of girls fighting." *Id.* at 13. She recalled "[i]t was just a lot of girls just fighting, just a lot." *Id.* at 13–14. There was "*a lot of punching and kicking*." *Id.* at 14 (emphasis added). Plaintiff said that she "d[id] not know the girls" who were

fighting, though she "[went] to school with them," and they were in her grade. *Id.* at 13–14. While Plaintiff saw the fights, she stated that she otherwise had "had no involvement at all" in them. *Id.* at 13, 16.

Plaintiff explained that the fight between the boys involved "two different friend groups." *Id.* at 16; *id.* at 14–16. Plaintiff "was trying to stop one of the boys from fighting"—"trying to pull them back and tell them like, ['] no, it's not worth it. Don't fight.[']"—but she "wasn't fighting personally." *Id.* at 17. She was trying to hold back her "boyfriend at the time" from fighting. *Id.*

When asked about her interaction with officers, Plaintiff explained that it became "really blurry," and she did "not remember a lot at all." *Id.* at 19. She "remember[ed] just me on the ground in handcuffs, blood all in my eyes. I couldn't see. Just crying. Then I was getting dragged. But before that, I really have no recollection, really, of what happened." *Id.* Plaintiff further explained: "I know that I was getting arrested. Then I was on the ground. Then I got my head bashed onto the ground. After that, I was trying to sit up. Then I got dragged from Kay Jewelers all the way to Planet Fitness by my handcuffs." *Id.* at 21. The whole time, she "couldn't see anything," because of "all the blood that was just in [her] eye." *Id.*

However, Plaintiff did eventually recall a few events that preceded the arrest. Plaintiff had gone over to her boyfriend. *Id.* at 24. Plaintiff explained that she "just wanted to make sure that he was okay. He was my boyfriend at the time and there was just a lot of police around him. It was nobody right there but him and the police." *Id.* at 25. He was in handcuffs. *Id.* Plaintiff recalled that she was "told to get back." *Id.* at 22. She said: "I did receive a get back command." *Id.* She admitted that she did not comply with the command—instead, she told the officers: "I was going to stand right here." *Id.*

3

Plaintiff testified that she did not leave when she was told to because "I wanted to make sure that he was okay." *Id.* at 36. Then, Plaintiff testified that "I was getting arrested and I know that the cops smashed my head on the ground." *Id.* at 20; *id.* at 21. According to Plaintiff, she did not push or shove any of the officers, and that she did not remember resisting them. *Id.* at 34.

Plaintiff testified that she later "was dragged by a female officer," who was Officer Breton. *Id.* at 26. Plaintiff explained that she "was screaming out because [she] was hurt, handcuffs behind [her] back and [they were] dragging [her] 50, 60 feet." *Id.* Plaintiff suffered wounds to her face during the altercation—requiring a trip to the hospital and stitches above her right eye, which injury she says have caused headaches following the incident. Am. Compl. ¶¶ 25, 31; Hicks Dep. at 37; Pl's Photos 1, 3. Plaintiff believes it was Sergeant Godsey who caused her injury because "after the event," her "dad came to the mall … and one of the policemen told [him] which cop it was." Hicks Dep. at 20.

　　2.　*Defendant Officers' Accounts*

Officer Lee Hughes was working the night shift on March 7, 2020. Dkt. 30-3 ("Hughes Dep.") at 21. Officer Hughes was on patrol when a call came in, the officer said "that they needed more units because there was a disorderly crowd," but "they said they were sufficient." *Id.* at 22. But "[b]riefly after that, an officer-needs-help call came out, so everybody responded at that point that wasn't tied up." *Id.*; *see also* Hughes Body Cam. at 49:05–15 (dispatch relays officer stating: "I'm in the food court. We need units to the food court."). Officer Romano also sped to the scene in his police cruiser with his lights activated. *See* Romano Body Cam. at 50:00–50:35 (continuing to mall but turning off emergency lights when "officer-needs-help" call discontinued).

Officer Hollie Breton was working an off-duty assignment providing security at the mall that evening. Dkt. 30-11 ("Breton Dep.") at 5, 9. Officer Breton testified that "[t]here were a lot of juveniles at the mall," and that a school resource officer coworker told Officer Breton that the juveniles attended "schools that had rivalries." *Id.* at 10. Officer Breton recalled that "there were a lot of individuals in the food court," and that "there was a growing concern that a fight would occur." *Id.* at 10–11. The officers' goal was to show there was an additional security presence "to prevent anything from even happening" in the first place. *Id.*

When Officer Hughes arrived, he "came in through the food court entrance," and another Officer (Thompson) told him that "there was still a large crowd between the aquarium and the food court, and [Thompson] felt there may be another fight." Hughes Dep. at 23. Officer Hughes and other five or six other officers headed to the aquarium before they started back to the food court. *Id.* at 23–24. Dozens of mostly high school students congregated at an intersection of the mall and several officers stood amongst the crowd. *See* Hughes Body Cam. at 50:35–51:40; *see also* Hughes Dep. at 29. Sergeant Godsie told Officer Hughes "I'm going to stand right here because this is going to break out in a minute." Hughes Body Cam. at 51:40–51:50; Godsie Body Cam. at 52:35–52:50.

Within seconds, the crowd started to shift, people began running, and Sergeant Godsie shouted: "They're fighting! They're fighting!" Hughes Dep. at 24; Godsie Body Cam. at 52:55–53:00. Sergeant Godsie and Officer Hughes ran over to the crowd where they "encountered two people on the ground with a crowd around them." Hughes Dep. at 24. The officers entered the crowd and brawl, yelling "Break it up! Break it up!" *See* Hughes Body Cam. at 51:55–52:20.

Officer Hughes testified that, as he approached the crowd, he saw "Officer Jackson attempting to detain a male, later identified as [D.H., Plaintiff's boyfriend]." Hughes Dep. at 24–

25. Hughes explained that Officer Jackson was "giving him commands and trying to get [D.H.'s] hands behind his back to put in cuffs. And [D.H.] was still resisting [Officer Jackson], so I helped him at that point get [D.H.] into custody." *Id.* at 25.[1] After they executed a "two-man takedown" of D.H., Officer Hughes recalled that "[w]e handcuffed him behind his back, we sat him upright, and we had an auxiliary officer kind of stand by with him while Jackson and I went back to the crowd." *Id.* at 27.

When Officer Romano arrived, he ran approximately thirty seconds through the mall until he came to the intersection where dozens of people were yelling and running—scattering in all directions. Romano Body Cam. at 52:00–52:40. Nearby stores including a Kay Jewelers began closing their security fencing while employees and patrons remained inside. *Id.* at 53:00–53:10. Officer Breton saw a fight break out over by Victoria's Secret. Breton Dep. at 12. She radioed to tell other officers about the fight. *Id.* at 12–13. She encouraged people to head to the mall's exits. *Id.* at 13. She saw "several pockets of fights and arguments and altercations between many of the individuals that were there." *Id.*

Officer Romano appears to have been the first officer to encounter Plaintiff. Just after Officer Romano appeared at the scene where D.H. had been arrested, Officer Romano stated on his intercom: "send us some more." Romano Body Cam. at 52:30–52:45. When Plaintiff pressed toward D.H., Officer Romano pushed her away, directing her to "get back" no less than four times, increasing his tone of voice each time. *Id*. at 52:45–53:00. Plaintiff refused the command

---

[1] Officer Hughes testified that his body camera "had become damaged," and while "you could see initial body camera footage of [him] … at some point during that struggle, it must have been broken or turned off." Hughes Dep. at 25. It appears, at this point during the altercation, the body camera is turned off.

6

each time, saying: "No … I'm gonna stand right here." *Id.* Her friend then briefly pulled Plaintiff

back. *Id.*

At that point, Sergeant Romano directed Officer Hughes and other officers nearby to

"form a line," "form a line." *Id.* at 53:10–53:35; *see also id.* at 54:00–54:15 (again). Officer

Hughes "hear[d] Sergeant Romano ordering all of us to 'form a line, form a line,'" so Hughes

"[took] a position there several paces in front of [D.H.] and the other person that had been on the

ground fighting with [D.H.] when we arrived." Hughes Dep. at 27. As Officer Hughes testified,

the police line was meant to "set up a perimeter where people aren't supposed to pass through,

for either safety of the officers behind it or civilians," including "the detainee we had in

handcuffs" who "can't fight back with the victim who was on the ground." Dkt. 30-5 ("J&DR

Hr'g") at 10 (J&DR court testimony).

Officer Hughes testified that then "[Plaintiff] came forward with her friend. She said

something about her boyfriend being back there, trying to get to him. I tried to explain to her that

it didn't matter, that I needed her to stand further back." Hughes Dep. at 27–28. He did not know

whether she was referring to the individual arrested or the victim, but regardless, he told Plaintiff

that "she needed to back away and leave or at least stand further back." *Id.* at 28; *id.* (recounting

that he told Plaintiff: "Leave, you need to leave."); *id.* at 40 (uncertainty about to who Plaintiff

was referring). Officer Hughes testified: "I gave her multiple commands to leave, and she

persisted and tried to walk past me again, and so I hand-checked her backwards." *Id.*[2] He said he

believed he had to "hand-check" Plaintiff twice. Plaintiff responded, "Don't touch me. Get off

me." *Id.* Officer Hughes also testified that Plaintiff "was yelling and swearing," but couldn't

---

[2] By "hand-check[ing]," Officer Hughes meant that he planted his hand "firmly on … the
sternum … the top of the chest up here to force someone back." Hughes Dep. at 29.

recall "the exact content" of what she was saying." *Id.* at 30. And "[s]he again did not leave. She attempted to walk past again." *Id.* at 29. Because "[s]he would not leave the area and she kept advancing toward [Officer Hughes]," he "made a decision to detain her at that point." *Id.*

Officer Hughes testified that he "told [Plaintiff] she was being detained," and he "grabbed ahold of her left arm," and "attempted to place her into a keylock behind her back to put handcuffs on her." *Id.* at 30. However, Plaintiff "pulled away" and "[h]er friend … was also attempting to pull her backwards away from [Officer Hughes]." *Id.* Officer Hughes testified that Plaintiff then "turn[ed] around and she trie[d] to push me off her with her free hand at that point," so he "reache[d] up and … [took] control of her left shoulder, left arm with [his] left hand, and [he] pushed her off balance backwards onto the ground." *Id.* Officer Hughes testified that it took "seconds and most, because she's flailing around, she's trying to get back to her feet. She's kicking her legs." *Id.* at 31. Officer Hughes then testified: "So at that point, I grabbed ahold of her leg and I turned her over to handcuff her behind her back face down." *Id. See also* Dkt. 30 at 6 (including additional record citations describing Plaintiff's detention).

Sergeant Godsie had observed Officer Hughes holding Plaintiff by her left arm, and he saw Plaintiff "trying to pull away from him." Dkt. 30-10 ("Godsie Dep.") at 44. He also saw "another large female" with Plaintiff. *Id.* Sergeant Godsie then observed that Plaintiff "turned and faced [Officer] Hughes in an aggressive manner, and she pushed him in the chest area with her right arm." *Id.* Officer Hughes was trying to put handcuffs on Plaintiff, but she resisted by "flailing her arms around trying to get away from the officer." *Id.* at 47. Then Officer Hughes took down Plaintiff to the ground—initially she was on her back and then she was rolled onto her stomach. *Id.* at 46–47. Officer Breton "saw [Plaintiff] with her butt on the ground, and she was

Case 6:21-cv-00043-NKM-RSB   Document 62   Filed 09/30/23   Page 9 of 35   Pageid#: 1692

yelling and screaming and kicking her feet at [Officer Hughes], while he was attempting to detain her." Breton Dep. at 17.

Sergeant Godsie and Officer Breton went to assist Officer Hughes. Godsie Dep. at 46; Breton Dep. at 17. Officer Breton assisted Officer Hughes position Plaintiff onto her stomach and place her in handcuffs. Breton Dep. at 17. When Sergeant Godsie arrived, Plaintiff "had raised up and was trying to stand back up." Godsie Dep. at 49. Sergeant Godsie put his hand on the back of her head and neck to keep her down. *Id.* at 49–50 (stating that he "moved [his] arm" in "a downward position" to counteract her "pushing up," and that he was "going to have to use some kind of leverage to make that force go the other way"). The use of force lasted three to four seconds. Godsie Body Cam. 54:38–54:42. Right after Plaintiff was taken to the ground, an individual (male) attempted to push toward and come up behind the officers as they were handcuffing her, until Officer Romano and another security guard pushed him back, yelling "Get back, get back." Romano Body Cam at 53:45–53:55. Sergeant Godsie then "diverted [his] attention" to yet another individual "that seemed as if they were getting ready to assault [Officer] Hughes or [him]." Godsie Dep. at 54. Sergeant Godsie got up and told him to "get the fuck back," that he would "fuck him up," and he drew but did not use his baton. *Id.* The individual backed up. *See* Godsie Body Cam. at 54:40–54:55.

Officer Breton then "noticed that there was blood," and she wanted to "make sure [Plaintiff] was okay and see where the blood was coming from." Breton Dep. at 19. Officer Breton then sat her up. *Id.* Officer Hughes similarly testified that when "[w]e roll[ed] [Plaintiff] over," "[w]e [saw] the blood," and then "Sergeant Godsie call[ed] for the medic." Hughes Dep. at 37. Sergeant Godsie called for "a medic for a face injury" within 30 seconds of his application

of force upon Plaintiff. *See* Godsie Body Cam. at 54:38–55:15. He also called for "more units to the food court." *Id.*

Officer Breton then sat up Plaintiff. Breton Dep. at 19. Officer Breton recalled that "[s]omeone had shouted to try and get her out of the situation, out of the center of the … floor." *Id.* at 19–20. Officer Breton "grabbed [Plaintiff] from underneath one of her arms." *Id.* at 20. She then pulled Plaintiff over to Kay Jewelers. *Id.* at 19. Officer Breton dragged her for about ten seconds to the store entrance. Shumate Body Cam. at 55:35–55:50.[3] Plaintiff yelled as Officer Breton was dragging her. *Id.* Officer Breton then stood her up, and at that point, Plaintiff's family approached and talked with Plaintiff and officers about what happened. *Id.* at 55:50–56:15.[4] Officer Breton walked Plaintiff and her family over to the entrance to Planet Fitness, where Officer Breton got Plaintiff napkins to wipe the blood from her eyes, and they waited there for the medic to arrive. *Id.* at 56:15–58:20.

Officer Breton testified that she did not initially stand Plaintiff up in moving her from the center of the floor to a position by Kay Jewelers because, "[f]rom my perspective, it wouldn't have been safe to do so. … There was plenty of people running around, and [Plaintiff] at the time could not see well. She also had not been following directions very well with us. By standing her up, had someone come over and tried to hurt her or me, and I was in the midst of trying to stand

---

[3] While Plaintiff testified that that Officer Breton dragged her for 50 to 60 feet, Hicks Dep. at 26–27, the video evidence does not reflect that Officer Breton dragged her anywhere near that distance, Shumate Body Cam. at 55:35–55:50. Indeed, in her complaint, she claimed it was "about 30 feet" that she was dragged, Am. Compl. ¶ 27, and Plaintiff's own brief contends that she was dragged "about thirty feet to a wall," Dkt. 50 at 5. That number also appears to exceed the actual distance reflected in the video. But, in any event, even assuming Plaintiff's account, the exact distance would be immaterial to the court's resolution of the Defendants' motion for summary judgment.

[4] Plaintiff testified that her cousin's mother called Plaintiff's father to come to the mall. Hicks Dep. at 20.

her up with both hands, in order to defend her or myself, she likely would have fallen to the floor." *Id.* Instead of doing that, Officer Breton testified that "[b]y me pulling her to the side while she was still seated," "had someone come up, I would have had at least one hand to protect myself and her." *Id.*

The following day (March 8, 2020), Officer Hughes obtained petitions for three charges against Plaintiff for her conduct on March 7, 2020: (1) assault and battery on a law enforcement officer, in violation of Va. Code § 18.2-57(C); (2) obstruction of justice, in violation of Va. Code § 18.2-460; and (3) disorderly conduct, in violation of Va. Code § 18.2-415. J&DR Hr'g at 5, 116–18. On November 4, 2020, the J&DR court found Plaintiff guilty of the first two offenses. J&DR Hr'g at 116–18. Plaintiff subsequently appealed her convictions to the Lynchburg Circuit Court. Dkt. 30-13 ("Cir. Ct. Order") at 1. The Circuit Court heard the appeal in April 2021. In the Circuit Court, the Commonwealth Attorney moved to *nolle prosequi* the assault and battery on a law enforcement officer charge. *Id.* Plaintiff further pled no contest to and was found guilty of obstruction of justice. *Id.* at 2.

<u>Procedural Background</u>

In August 2021, Plaintiff filed suit in this Court against the City of Lynchburg, and three officers involved in the March 7, 2020 incident: Officers Hughes and Breton and Sergeant Godsie. Dkt. 1. Plaintiff filed the operative amended complaint in November 2021. Dkt. 9 ("Am. Compl.").

Defendants subsequently filed a motion to dismiss and in May 2022, this Court entered an opinion and order granting in part and denying in part Defendants' motion. Dkt. 22. The Court dismissed Plaintiff's claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent training and supervision. *Id.* at 4–7. But the Court

denied Defendants' motion to dismiss Plaintiff's municipal liability claim against the City on the

basis of "ratification." *Id.* at 5–6. Following that decision, the following claims remained:

excessive force in violation of the Fourth Amendment, assault and battery, gross negligence,

malicious prosecution, and municipal liability. This matter is now before the Court on

Defendants' motion for summary judgment, Dkt. 29, which is ripe for disposition.[5]

## Standard of Review

"Summary judgment is appropriate only if 'the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan*

*v. Cotton*, 572 U.S. 650, 656–57 (2014) (quoting Fed. R. Civ. P. 56(a)). "The party seeking

summary judgment bears the initial burden of demonstrating that there is no genuine issue of

material fact." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant has made this threshold

demonstration, the nonmoving party, to survive the motion for summary judgment, must

demonstrate specific, material facts that give rise to a genuine issue." *Sedar*, 988 F.3d at 761

(citing *Celotex Corp.*, 477 U.S. at 323). A non-movant's position must be supported by more

than "the mere existence of a scintilla of evidence" or "conclusory allegations or denials," to

"preclude granting the summary judgment motion." *Id.* (citations omitted). In ruling on summary

judgment, the court must "adhere to the axiom that … '[t]he evidence of the nonmovant is to be

---

[5] In addition, Plaintiff has filed a motion to exclude the expert report, opinion and testimony of Lt. Samuel Grady Orr—Defendants' expert on the use of force. Dkt. 26. Defendants have also filed a motion to exclude testimony and opinions of Phillip Spinner, including introduction of edited video footage, Dkt. 31; a motion to exclude testimony and opinions of Dr. Brenda Waller, Plaintiff's expert expected to testify on the nature and extent of her injuries, Dkt. 33; and a motion to exclude testimony and opinions of Mark Dunston, Plaintiff's expert on police practices and procedures, Dkt. 35. Finally, Defendants have filed a motion *in limine* and objections to Plaintiff's Rule 26(a)(3) pretrial disclosures. Dkt. 59.

believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 572 U.S. at 651

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Viewing the evidence in the light most favorable to the nonmoving party and refraining

from weighing the evidence or making credibility determinations, "[t]he court may grant

summary judgment only if it concludes that the evidence could not permit a reasonable jury to

return a favorable verdict. *Sedar*, 988 F.3d at 761.

Fourth Amendment Violation – Excessive Force

Defendants contend that qualified immunity shields them from Plaintiff's claims.

Qualified immunity protects police officers performing discretionary functions from civil

damages suits so long as their conduct does not violate clearly established law that a reasonable

officer should have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts apply a two-

part inquiry in ruling upon an assertion of qualified immunity at the summary judgment stage.

The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the

injury … show the officer's conduct violated a [federal] right." *Tolan*, 572 U.S. at 655–56

(quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second is whether the right in question

was "clearly established" at the time of the violation. *Id.* at 656. Courts may address the inquiry

in any order. *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018). As a result, officers are not

liable for "bad guesses in gray areas," but rather for "transgressing bright lines." *Maciariello v.*

*Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). The Court will first consider whether Plaintiff has

shown the officers' conduct violated a federal right, before considering whether that right was

"clearly established." As Plaintiff has failed to establish either, the Court finds that Defendant

Officers are entitled to qualified immunity.

1.  <u>Defendant Officers' Use of Force Was Reasonable – No Violation of a Federal Right</u>

The Fourth Amendment prohibits police officers from using unreasonable or excessive force in the course of making an arrest. *Wilson v. Prince George's Cty., Md.*, 893 F.3d 213, 219 (4th Cir. 2018). Determining whether a use of force to conduct a seizure is "reasonable" under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (cleaned up). The "reasonableness" of a use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

The test is an objective one—asking whether an officer's actions are objectively reasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Courts consider the following factors, among others, in determining the reasonableness of a use of force: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. Ultimately, the inquiry asks "whether the totality of the circumstances justifie[s] a particular sort of ... seizure." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985).

Here, the totality of circumstances demonstrates that each of the Defendant Officers' actions vis-à-vis Plaintiff were reasonable amidst the chaotic scene at the mall on March 7, 2020. Fights were breaking out left and right. Dozens were running in all directions. Employees and customers barricaded themselves in stores. Many ignored officers' calls to leave the premises. These were just the sort of "tense, uncertain, and rapidly evolving" circumstances that force

officers "to make split-second judgments … about the amount of force that [was] necessary in a particular situation." *See Graham*, 490 U.S. at 396–97.

Such highly charged circumstances—as include ongoing brawls or which are marked by the presence of large and unruly crowds—factor into the reasonableness of an officer's use of force employed in that context. And that is the case, even though, with the benefit of hindsight, a lesser use of force would have been more appropriate. *See, e.g.*, *Nadelin v. Martin*, 166 F. App'x 333 (4th Cir. 1998) (unpublished per curiam) (affirming summary judgment for officer stemming from encounter with "a loud and boisterous crowd of twenty to thirty individuals," including ongoing fistfights, where "[t]he overall scene was one of confusion, and the crowd was difficult to control"); *Moore v. Vangelo*, 222 F. App'x 167, 171 (5th Cir. 2007) (holding use of police dog objectively reasonable when "[t]he melee going on before [the officer] was an ongoing assault. Three people were involved in the fight and [the officer] was, at least temporarily, alone."); *Dimes-Smith v. District of Columbia*, No. 04-7164, 2005 WL 79031, at *1 (D.C. Cir. Jan. 11, 2005) (summary order) (holding that "the officer's use of force does not appear to have been unreasonable under the circumstances, given the … situation he faced in attempting to control a large, unruly, and brawling crowd"); *Case v. Stewart*, No. 3:03-cv-388, 2007 WL 37741, at *1 (W.D.N.C. Jan. 4, 2007) (finding "no authority" to support the plaintiff's contention that, "in the midst of large, unruly, and near-riotous crowds," the officer "should have known that he was constitutionally required to delay gaining control of [the plaintiff] and to continue to argue with him as he attempted to thwart the attempts to clear the area").

So too here, application of the *Graham* factors substantiates the conclusion that the Defendant Officers' use of force vis-à-vis Plaintiff was objectively reasonable under all the circumstances. The Court turns to the first *Graham* factor: "the severity of the crime at issue."

*See Graham*, 490 U.S. at 396. To be sure, Plaintiff was ultimately convicted of obstruction of justice, which is only a misdemeanor offence. Va. Code § 18.3-460; Cir. Ct. Order at 2. Perhaps, if that were the end of the matter, this factor would weigh in Plaintiff's favor. *Cromartie v. Billings*, 837 S.E.2d 247, 257 (Va. 2020). However, in the excessive force analysis, the "focus is on the circumstances as they existed at the moment force was used." *Anderson v. Russell*, 247 F.3d 125, 132 (4th Cir. 2001). And this factor "requires considering the criminal activity that the officers witnessed and the crimes that had been reported." *Kohler v. Brown*, No. 1:21-cv-28, 2023 WL 6173503, at *4 (W.D. Va. Sept. 22, 2023) (citing *Moody v. City of Newport News*, 193 F. Supp. 3d 530, 548 (E.D. Va. 2016)).

Here, at the moment force was used, Officers Hughes and Breton and Sergeant Godsie witnessed and had a more-than-reasonable belief that Plaintiff was not just committing a relatively minor crime. Rather, she was fighting back, resisting arrest, and had committed assault and battery on a law enforcement officer—a felony in Virginia. Va. Code § 18.2-57(C). Plaintiff ignored Officer Romero's four commands to get back. Plaintiff then ignored Officers Hughes' further commands to "get back," and pressed forward despite his "hand check." At that point, when Officer Hughes tried to place her arrest, Plaintiff fought back against him—using physical force against Officer Hughes and engaging in a brief scuffle with him while standing, and then kicking and lashing out on the ground—attempting to resist arrest. *See* Godsie Body Cam at 54:40–55:00; Romano Body Cam. at 52:40–53:00.

Similarly, Sergeant Godsie testified that he observed that Plaintiff "turned and faced [Officer] Hughes in an aggressive manner, and she pushed him in the chest area with her right arm." Godsie Dep. at 44. Officer Hughes similarly testified that when he grabbed Plaintiff to detain her, she not only "pulled away," and her friend "was also attempting to pull her

backwards," but then Plaintiff "turn[ed] around and she trie[d] to push me with her free hand at that point." Hughes Dep. at 30; *see also* JD&R Hr'g at 14 ("But she turned around and tried to push me off of her while I was telling her to put her hands behind her back."); *id.* at 17 (testifying that Plaintiff "actually pushed" him at that time); *id.* at 26 (similar). Officer Breton testified that Plaintiff was on the ground "yelling and screaming and kicking her feet at the officer, while he was attempting to detain her." Breton Dep. at 17. Evidence of Plaintiff's physical contact with Officer Hughes, especially that she pushed him in the chest after he attempted to arrest her, supported an assault and battery on a law enforcement officer charge. *See* J&DR Hr'g at 116–17. As described below that charge was supported by probable cause. *See infra* at p. 27–28. Moreover, the crimes at issue were serious even though they did not cause physical harm. *Wilson v. Flynn*, 429 F.3d 465, 468 (4th Cir. 2005) (holding, even without evidence of physical harm resulting from an assault, a reasonable officer could conclude that a suspect's conduct showed an intention to hurt and therefore was severe under this factor).

Indeed, even "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back … the officer would be justified in using more force than in fact was needed." *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002). That is because "the Fourth Amendment does not require omniscience." *Anderson*, 247 F.3d at 132. Yet the officers had a more-than reasonable belief that Plaintiff would fight back upon arrest, and they also witnessed her fighting back. None of that was undermined because ultimately, Plaintiff was only convicted of obstruction of justice in the circuit court. On balance, considering the evidence of obstruction

of justice but also of assault and battery of a law enforcement officer (though a non-egregious example), the Court concludes this factor weighs in Defendants' favor.[6]

The third *Graham* factor also weighs in Defendants' favor, as Plaintiff was "actively resisting arrest" as well as also attempting to get away at the time of the use of force. *See Graham*, 490 U.S. at 396. Again, Plaintiff does not dispute that she disobeyed officers' commands that she leave, and that instead she yelled that she was going to stand right here. Hicks Dep. at 22. The video evidence further demonstrates that Plaintiff not only was initially pulling away from Officer Hughes when he attempted to arrest her (and that her friend attempted to pull her away), but that she further engaged in a physical altercation with him and was kicking and screaming when she was pulled to the ground. Godsie Body Cam. at 54:20–54:50. Plaintiff's failure to follow officers' instructions and her attempts to wrestle from Officer Hughes' grip to handcuff her, as well as her kicking and screaming once on the ground, demonstrate she was actively resisting arrest. Under such circumstances, this factor weighs in Defendants' favor. *See Flynn*, 429 F.3d at 468 (concluding that this factor weighed against plaintiff when he "disobeyed Officer Flynn's orders and physically resisted when Officer Flynn attempted to put [plaintiff] in handcuffs").

Finally, the second *Graham* factor (i.e., "whether the suspect poses an immediate threat to the safety of the officers or others"), further weighs in Defendants' favor—albeit to a lesser degree. *See Graham*, 490 U.S. at 396. Officers reasonably made a concerted effort to "form a line" where the prior fight was and around the individual under arrest. *See, e.g.*, Hughes Dep. at 27 ("I hear Sergeant Romano ordering all of us to 'form a line, form a line.' So I take a

---

[6] Even if the Court concluded that this factor weighed in Plaintiff's favor, it would not materially affect the Court's holistic consideration of the *Graham* factors.

position there several paces in front of [the arrested individual] …"). Officer Hughes testified the

purpose of setting up that police perimeter was for the safety of the officers and civilians behind

it, and indeed, the individual under arrest and handcuffed on the ground (Plaintiff's then-

boyfriend). J&DR Hr'g at 10. Here again, video evidence shows that Plaintiff refused several

officers' commands to get back from them, but rather she and her friend persisted in moving

toward them and closer to an individual they had arrested, who lay seated on the ground,

handcuffed behind his back. Romano Body Cam. at 52:40–53:00 (Plaintiff, refusing orders to

"get back," yelling, "I'm going to stand right here"). And Plaintiff admits she refused their

orders. Hicks Dep. at 22, 24–25. Of course, she explained that she was just trying to get closer to

her boyfriend. *Id.* at 24–25; Hughes Dep. at 27–28. However, Officer Hughes did not know

whether Plaintiff meant that her boyfriend was the individual under arrest or the victim of the

earlier fight. Hughes Dep. at 40. In any event, the officers were certainly not required to accept

her statement at face value. *See, e.g.*, *District of Columbia v. Wesby*, 583 U.S. 48, 68 (2018)

(explaining that "[t]here was no controlling case … that officers must accept a suspect's innocent

explanation at face value."). *United States v. Mancoll*, No. 2:22-cr-82, 2023 WL 2581307, at *3

(E.D. Va. Mar. 20, 2023) ("Courts do not require an officer to accept at face value every

explanation or answer a suspect gives.").

　　　　Further still, as previously described, Plaintiff was actively resisting arrest and fighting

with Officer Hughes when he attempted to handcuff her, further indicating that she presented

some threat to their safety or those around them.[7]

---

[7] The Court also considers it relevant to the threat analysis that Plaintiff's friend was actively trying to pull her away from Officer Hughes, assisting in her resisting arrest. Godsie Body Cam. at 54:25–54:40. And that at least one other individual immediately tried to approach the officers and intercede with her arrest until he was forcibly pushed back by Officer Romano. Romano Body Cam at 53:45–53:55.

To be sure, she did not have a firearm or other weapon. Nor did she, as Plaintiff argues, threaten anyone or fight anyone before the arrest. *See* Dkt. 50 at 20. Plaintiff also makes much of the fact that Plaintiff was a juvenile. *Id.* at 20–21. That is certainly relevant. However, notably the video evidence shows that Plaintiff was in fact larger and taller than Officer Breton. Shumate Body Cam. at 58:10–58:20.

Lastly, the Court makes clear that each of the Defendant Officer's use of force was objectively reasonable and proportionate to the circumstances immediately before each officer. To recap: Officer Romero directed Plaintiff back numerous times, she refused. Officer Hughes then again directed Plaintiff to back up from the police line. She again refused. He pushed her back. She pressed forward. Officer Hughes attempted to handcuff her. She actively resisted and engaged in a physical altercation with him. When Plaintiff was resisting arrest, including kicking and thrashing about on the ground, Sergeant Godsie came over and applied additional force to her head and neck to keep her from rearing up. The force was about four seconds. Officer Breton assisted with getting Plaintiff on her back to handcuff her, and then helped turn her back over. When the officers saw blood, Sergeant Godsie called the medic about thirty seconds after her injury. Officer Breton acted on direction of another officer to pull a seated and handcuffed Plaintiff to the side of the walkway, dragging her for about ten seconds. Officer Breton then stood up Plaintiff, allowed her to talk with her family, and walked her and her family a distance to Planet Fitness where she got them napkins to wipe the blood from her face to await treatment by a medic.

Even if, with the benefit of 20/20 hindsight, a lesser amount of force might have been appropriate, that is not the relevant test. Indeed, "[n]ot every push or shove, even if it may later seem unnecessary in the pace of a judge's chambers … violates the Fourth Amendment."

*Graham*, 490 U.S. at 396 (citation omitted). Application of the *Graham* factors and considering

the totality of the circumstances before the Defendant Officers at that time, the Court concludes

that their actions with respect to Plaintiff were objectively reasonable. Plaintiff's excessive force

claim therefore fails.

      2.  <u>Defendant Officers Did Not Violate any "Clearly Established" Right</u>

In any event, the Court concludes that the Defendant Officers are entitled to qualified

immunity because they did not violate any clearly established constitutional right. "To be clearly

established, a right must be sufficiently clear that every reasonable official would have

understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664

(2012) (quotation marks omitted). "The law is clearly established such that an officer's conduct

transgresses a bright line when the line has been authoritatively decided by the Supreme Court,

the appropriate United States Court of Appeals, or the highest court of the state." *Wilson v.*

*Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (quotation marks omitted).

The questions then are whether such precedent clearly established in March 2020 that the

Fourth Amendment prohibited an officer responding to an unruly crowd from arresting an

individual who refuses to obey the officer's commands to get back; from using a short

application of force to the back of an individual who, while lying on the ground, continues to

resist arrest; or from dragging a handcuffed and seated individual by the arm to another area

roughly thirty feet away. Or, at a higher level of abstraction, the inquiry is whether "the officer

took a situation where there was obviously no need for the use of any significant force and yet

took an unreasonably aggressive tack that quickly escalated it to a violent exchange when the

suspect instinctively attempted to defend himself." *Smith v. Ray*, 781 F.3d 95, 104 (4th Cir.

2015); *see also* Dkt. 50 at 19–20 (citing *Smith*). Given the Court's analysis above that the

officers' conduct was indeed objectively reasonable under these circumstances, the Court similarly concludes that—whether the issue be framed in a more factually tailored manner or framed as done in *Smith*—no clearly established law forbade such limited uses of force.

Plaintiff points to three cases to argue that the officers' conduct violated clearly established law. *See* Dkt. 50 at 18–20. All concern materially different factual postures far removed from the case at hand, and none constitute clearly established law demonstrating the Defendant Officers' conduct was unlawful.

First, Plaintiff cites *Cromartie*, in which the Supreme Court of Virginia concluded that an officer's use of force against a motorist was objectively unreasonable, and contrary to clearly established law. *See Cromartie v. Billings*, 837 S.E.2d 247 (Va. 2020). There, the officer stopped Cromartie's vehicle for speeding. She was in her fifties, weighed 100 pounds, was four foot, nine inches tall, and afflicted by numerous health and hearing issues. *Id.* at 250–51. When the officer knocked on the window and told her to roll it down, she continued to talk on her phone; once prompted again, she said "Hey officer, leave me alone." "Mere seconds passed before [the officer] opened the driver's door, grabbed [Cromartie] by the arm, and forced her face-down onto the pavement." *Id.* at 251. Then, once the officer forced her to the pavement, he "placed his weight on [her] back," injuring her "forehead, teeth, lip, right eye, and right knee." *Id.* The court found the use of force unreasonable under the *Graham* factors, noting that the offense at issue was a minor one (speeding); that she posed no immediate threat to anyone sitting in her car that was turned off and noting she "was a 100-pound woman with several health issues"; and that she "did not attempt to flee or resist arrest." *Id.* at 257.

Plaintiff also cites *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994), a case "ar[sing] out of a scuffle between a police officer and a citizen over a lost five dollar bill." *Id.* at 171. After the

plaintiff picked up the money dropped by a woman at a bus station ticket window, an officer followed and "a struggle began," the officer "ultimately us[ing] disabling force to gain control over [the plaintiff]." *Id.* The Fourth Circuit held, "[w]hen all the factors are considered *in toto*, it is impossible to escape the conclusion that a man suffered a serious leg injury over a lost five dollar bill." *Id.* at 174. "At worst, [the plaintiff] picked up a five dollar bill that he knew had been lost by someone else," an offense not "as serious as pickpocketing." *Id.* Nor was there any suggestion he was a threat to anyone, but rather the evidence showed he was mentally disabled and "relatively passive." *Id.* While there was a dispute whether the plaintiff resisted arrest, or had only "instinctively tr[ied] to protect himself from the defendant's onslaught," the court held that, combined with the other *Graham* factors, no reasonable officer could have believed the conduct lawful regardless.

Lastly, Plaintiff relies on *Smith v. Ray*, 781 F.3d 95 (4th Cir. 2015). In that case, an officer was speaking with an occupant of a residence, looking for a missing juvenile. The plaintiff stepped out on the front stoop and answered a number of the officer's questions, and when the officer asked if an acquaintance of the juvenile's was inside, she said he was there and "hold on," that she would get him. *Id.* at 98. Then, "[a]s [the plaintiff] opened the screen door, [the officer] reached over her right shoulder and slammed the door shut." *Id.* Startled, "she took a single step away from the house off the small stoop" (but did not run), and the officer grabbed her arm "with no verbal communication." *Id.* The officer than grabbed her and "threw her to the ground," and then "jumped on her, jamming his full weight into her back with his knee, and painfully twisting her arm behind her back." *Id.* The Fourth Circuit held that that, especially in light of *Rowland*, "no reasonable officer could have believed that, rather than answer the previously compliant young woman's legitimate question concerning why [the officer] was

suddenly grabbing her, [he] was justified in throwing her to the ground, slamming his knee into her back, and wrenching her arm behind her." *Id.* at 103.

These cases, *Cromartie*, *Rowland*, and *Smith*, all concern materially different facts from those before the Court in this case. The officers in each case were presented with relatively placid circumstances, an officer pulling a woman over for a speeding ticket who briefly refused to roll down her window; a man who walked away with a five-dollar bill he found that wasn't his; and a cooperative occupant of a house going to get an individual the officer asked about. To be sure, it is clearly established that an officer cannot take a "situation where there was obviously no need for the use of any significant force," and deploy an "unreasonably aggressive tack that quickly escalate[s] to a violent exchange when the suspect instinctively attempted to defend himself." *Smith*, 781 F.3d at 104. But that was not the case here. And none of the cases Plaintiff cites involved anything close to the highly charged, fluid and tense circumstances like those that confronted the Defendant Officers at the mall on March 7, 2020. By Plaintiff's own admission, numerous fights broke out; officers had to make arrests, including of Plaintiff's then-boyfriend for fighting; dozens ran in all directions; many ignored officers' commands to leave; and the stores quickly shuttered with employees and customers inside to avoid the chaos. *See also Nadelin*, 166 F. App'x 333, at *3–4 (considering fact that officer was confronted with a "loud and boisterous crowd," many "engaged in fistfights," and where the "overall scene was one of confusion and the crowd was difficult to control," in finding qualified immunity protected officer from excessive force claim); *Case*, 2007 WL 37741, at *5 (holding officer entitled to qualified immunity in light of fast-moving circumstances making an arrest "in the midst of large, unruly and near riotous crowds").

24

At bottom, because the Defendant Officers did not violate any clearly established constitutional law with respect to their actions here, the Court holds that they are entitled to qualified immunity on Plaintiff's § 1983 excessive force claim. The Court will award Defendants summary judgment as to that claim.

Assault and Battery; Gross Negligence

Next, Plaintiff has brought state law claims, including assault and battery (against Officers Hughes, Breton and Godsie), and gross negligence (apparently against all Defendants). Am. Compl. ¶¶ 67–71, 87–91. Police officers are "legally justified in using reasonable force to execute their lawful duties." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009). "Accordingly, if reasonable force is used by police officers in execution of their lawful duties, they are immune from suit for such actions." *Ware v. James City Cnty.*, 652 F. Supp. 2d 693, 712 (E.D. Va. 2009). Plaintiff relies entirely on her excessive force arguments in support of these state law claims. *See* Dkt. 50 at 29. The Court concludes that here, as is often the case, Plaintiff's state law claims must fall with her excessive force claim. *See Johnson v. Dep't of Alcoholic Beverage Control*, No. 3:15-cv-55, 2016 WL 7235836, at *7 (W.D. Va. Dec. 13, 2016) (collecting authority).

As Defendant Officers are entitled to summary judgment on Plaintiff's excessive force claim under § 1983, so too must Plaintiff's assault and battery and gross negligence claims fail, brought against the same officers based upon the same conduct. *See Rowland*, 41 F.3d at 174 (explaining that a "parallel state law claim of assault and battery is subsumed within the federal excessive force claim"); *Njang v. Montgomery Cnty., Md.*, 279 F. App'x 209, 216 (4th Cir. 2008) (unpublished, per curiam) (concluding that Fourth Amendment excessive force inquiry "also controls [a party's] actions for battery and gross negligence). *Calloway v. Lokey*, 948 F.3d 194, 205 (4th Cir. 2020) (affirming district court's dismissal of state law claims when Fourth

25

Amendment claim failed). The Court will award Defendants summary judgment on the related state law assault and battery claims.

Virginia Malicious Prosecution

Plaintiff also brought a malicious prosecution claim. Am. Compl. ¶¶ 92–95. She alleged that Officer Hughes "swore out the warrants on [Plaintiff] for assault on law enforcement, when he knew such charges were without any factual basis and only to provide a cover for his and Godsie's criminal and assaultive behavior." *Id.* ¶ 93. Plaintiff further claimed that the charges were later dismissed, and that Officer Hughes swore out the warrants without probable cause. *Id.* ¶¶ 94–95.

Officer Hughes obtained a petition for Plaintiff on the charge of assault and battery on a law enforcement officer, in violation of Va. Code § 18.2-57(C). *See* J&DR Hr'g at 27, 114–15; Dkt. 30 at 9. Officer Hughes also obtained petitions for Plaintiff on charges of obstruction of justice (in violation of Va. Code § 18.2-460), and disorderly conduct (Va. Code § 18.2415). J&DR Hr'g at 5, 117–18; Dkt. 30 at 9. The J&DR court found her guilty of assault and battery on a law enforcement officer, based upon her "active push" to Officer Hughes' chest, and found her guilty of obstruction of justice, but not disorderly conduct. J&DR Hr'g at 116–18. Plaintiff appealed her convictions to the Lynchburg Circuit Court. Dkt. 30-13 ("Cir. Ct. Order"); Dkt. 30 at 9. On appeal, the Commonwealth moved for *nolle prosequi* of the assault and battery on a law enforcement officer charge, and Plaintiff pled no contest to the petition for obstruction of justice and was found guilty of that count. Dkt. 30-13.

In Virginia, a plaintiff in a malicious prosecution case ultimately must prove "by a preponderance of the evidence that the prosecution was: (1) malicious; (2) instituted by, or with the cooperation of, the defendant; (3) without probable cause; and (4) terminated in a manner not

26

unfavorable to the plaintiff." *Hudson v. Lanier*, 497 S.E.2d 471, 473 (Va. 1998). "Actions for malicious prosecution in Virginia and the requirements for maintaining such actions are more stringent than those applied to other tort cases to ensure that criminal prosecutions are brought in appropriate cases without fear of reprisal by civil actions." *Lewis v. Kei*, 708 S.E.2d 884, 889 (Va. 2011). In the context of a Virginia malicious prosecution claim, probable cause means "knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected." *Bennett v. R&L Carriers Shared Servs., LLC*, 492 F. App'x 315, 324 (4th Cir. 2012) (citation omitted); *see also Kaley v. United States*, 571 U.S. 320, 338 (2014) (probable cause "is not a high bar").[8] Considering that "it is a mainstay of Virginia jurisprudence that the common law crime of assault and battery may be accomplished by the slightest touching or without causing physical injury to another," Va. Code § 18.2-57(C) "proscribes a very broad range of conduct." *United States v. Carthorne*, 726 F.3d 503, 514 (4th Cir. 2013). "[T]he burden of proof is always on the plaintiff to show a lack of probable cause." *See Patel v. Shumate*, No. 1:22-cv-3, 2023 WL 5808914, at *4 (W.D. Va. Sept. 7, 2023) (citation omitted).

Defendants challenge the third and fourth elements of the claim. *See* Dkt. 30 at 30–32. Defendants argue that Plaintiff has not satisfied the third element, i.e., that the charge has been pursued without probable cause. Dkt. 30 at 30. Upon its review of the record, the Court readily concludes that Office Hughes had probable cause to support the charge for assault and battery on a law enforcement officer.[9] Ample evidence in the record supports that Plaintiff refused to

---

[8] "The necessary factual predicates for probable cause under federal law and Virginia law are essentially the same." *King v. Darden*, No. 3:17-cv-742, 2019 WL 1756531, at *4 (E.D. Va. 2019), *aff'd* 812 F. App'x 163 (4th Cir. 2020).

[9] The Court does not base its determination of probable cause on the J&DR court's finding her guilty of assault and battery on a law enforcement officer, in view of Plaintiff's

comply with officers' commands to "get back," but persisted in pressing forward to try to get to

her then-boyfriend—who was under arrest and handcuffed in police custody. *See* Hicks Dep.

at 22, 24–25; Romano Body Cam. at 52:40–53:00 (refusing orders to "get back," yelling, "I'm

going to stand right here"). Further, when Plaintiff ignored Officer Hughes' commands to "get

back," and pressed forward despite his "hand-check," he tried to place her under arrest. Plaintiff

fought back against him—using physical force against Officer Hughes and engaging in a brief

scuffle with him while standing and then kicking and lashing out on the ground, attempting to

resist arrest. *See* Godsie Body Cam at 54:40–55:00. As previously described, Sergeant Godsie

and Officer Hughes testified that Plaintiff pushed him in the chest when he was attempting to

arrest her. Godsie Dep. at 44; Hughes Dep. at 30; JD&R Hr'g at 14, 17, 26. And Officer Breton

testified that when Plaintiff was on the ground "she was yelling and screaming and kicking her

feet at the officer, while he was attempting to detain her." Breton Dep. at 17.

All of this evidence, including body camera footage showing Plaintiff engaging in a

physical altercation with Officer Hughes, more than demonstrates probable cause for assault and

battery upon a law enforcement officer—an offense that only requires the slightest touching. As

the Court concludes that the assault and battery action was supported by probable cause,

---

appeal of that ruling and the Commonwealth's decision to *nolle prosequi* that charge in the
Lynchburg Circuit Court. *See* Dkt. 30-13 at 1. Of course, as Defendants point out, in cases in
which the plaintiff has been convicted and that conviction stands on appeal or has not been
appealed, that determination is "conclusive" on the issue of probable cause. *See, e.g.*, *Blackburn
v. Town of Coeburn*, No. 1:06-cv-114, 2007 WL 1577506, at *3 (W.D. Va. June 1, 2007)
(explaining that a plaintiff's "[c]onviction of a crime is conclusive evidence of probable cause
and bars any subsequent action for malicious prosecution," and that in that case, "because the
plaintiff did not appeal her convictions, those convictions are final and conclusive of probable
cause").

Plaintiff's malicious prosecution claim fails.[10] Accordingly, Defendants are entitled to summary judgment on the claim.

*Monell* Claim – Unconstitutional Policy or Custom

Next, Plaintiff brings a claim against the City of Lynchburg, asserting it is subject to municipal liability pursuant to § 1983 for adopting an unconstitutional custom or policy. Am. Compl. ¶¶ 103–12. Plaintiff asserts that the City adopted myriad types of unconstitutional customs or policies. *Id.* ¶ 107. But in opposing Defendants' motion for summary judgment, Plaintiff focuses on her failure to train claim. Dkt. 50 at 22–29; Dkt. 54 at 9. She argues that "[t]he City's lack of managing oversight condones the Lynchburg Police Department deficiency in training," and that the City had "constitutionally deficient training" with respect to the use of force. Dkt. 50 at 22, 26. She argues the City lacked "de-escalation training," and training "with respect to dealing with juvenile issues and situations." *Id.* at 22–23.

At the outset, the *Monell* claim fails because Plaintiff has not established any underlying constitutional violation. *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001) ("The law is quite clear in this circuit that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee."). Even if Plaintiff had, however, Plaintiff's failure-to-train claim does not pass muster under *Monell* and its progeny.

"Local governing bodies … can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where … the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and

---

[10] The Court need not consider Defendants' alternative argument that Plaintiff also failed to satisfy the fourth element of malicious prosecution—that the offense was "terminated in a manner not unfavorable to the plaintiff.

promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, "municipal liability could not be premised on the mere fact that the municipality employed the offending individual." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 810 (1985). Rather, "municipal liability could only be imposed for injuries inflicted pursuant to government 'policy or custom.'" *Id.* (quoting *Monell*, 536 U.S. at 694). A municipal policy or custom may be established:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 1999) (internal citation and quotations omitted).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). However, a municipality's "culpability is at its most tenuous where a claim turns on a failure to train." *Id.* Thus, "[a] pattern of constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62.

Plaintiff's failure-to-train claim has numerous deficiencies, but most notable perhaps is the showing with respect to deliberate indifference. As Plaintiff has framed this claim, this single incident on March 7, 2020, demonstrates the City did not adequately train its officers on the use of force. *See* Dkt. 50 at 26–27; Dkt 54 at 13. But, as Plaintiff acknowledges, "a single incident is almost never enough to warrant municipal liability." *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020); Dkt. 50 at 26. However, to be sure, the Supreme Court "has left open the possibility that 'in light of the duties assigned to specific officers or employees the need

30

for more or different training [may be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need'—the so-called *Canton* exception." *Estate of Jones*, 961 F.3d at 672 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). And in *Estate of Jones*, the Fourth Circuit held that the officers' shooting of a homeless, schizophrenic man who was walking along a road rather than a sidewalk, did not fall into that limited *Canton* exception. 961 F.3d at 672. The court explained that "Jones's death is an isolated incident of excessive force that cannot fall into the *Canton* exception, because Martinsburg *did* have an aggression policy, and the Estate has not shown how or why that policy is deficient—except by pointing to this single incident." *Id.* In other words, the argument was "that this tragic incident makes obvious that the policy was not sufficiently implemented in training." *Id.*

Plaintiff's failure-to-train claim takes a similar tack concerning the incident at the mall, focusing largely, albeit not entirely, on Plaintiff's own claim.[11] And yet, as in *Estate of Jones*, "[a]t its core, the strict *Monell* test asks for some level of notice" to the municipality such that it "either knew or should have known about the deficiency, so it could remedy that deficiency." 961 F.3d at 672. Like the circumstances in *Estate of Jones*, nothing in the number of alleged instances of excessive force on that night could have put the City on earlier notice of the need to

---

[11] *See* Dkt. 50 at 25–26 ("The testimony regarding the failures regarding policies of the City with respect to juveniles in situations such as the Plaintiff, as well as the failures of the supervising officers to properly train with respect to de-escalations, as well as failing to adequately supervise and allow the escalation of the situations by sending the Lynchburg Police Force to essentially storm the Mall scene that had not escalated to any violent events, demonstrates" genuine issues of material fact this claim should proceed to a jury); *id.* at 26 (describing incident involving Plaintiff, as well as "young man threatened with words and actions by Godsie; young girls pushed in chest by Hughes; [and another] being pushed/hit with [another officer's] baton several times").

better train its officers about the use of force. *See id.* Thus, Plaintiff cannot show deliberate indifference as necessary to establish the failure-to-train claim.

Plaintiff's failure-to-train claim also fails because Plaintiff has not pointed to any specific deficiency in the City's excessive force policy. *See Rowell v. City of Hickory*, 341 F. App'x 912, at *4 (4th Cir. 2009) (unpublished per curiam); *accord Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 309 (D. Md. 2020) (explaining that, on a motion to dismiss, "a plaintiff must provide factual allegations about the specific deficiencies in the [police department's] training to state a failure to train claim"). Plaintiff's claim only speaks in the broadest possible terms about alleged shortcomings in training concerning juveniles. *See* Dkt. 50 at 22 (arguing that "the training with respect to dealing with *juvenile issues and situations* was apparently non-existent") (emphasis added); *id.* (arguing there should have been "specific training on dealing with juveniles"). While Plaintiff identified a supposedly missing topic (juveniles), the argument is bereft of any specific shortcoming identified in training.

Plaintiff's claim was similarly undeveloped with respect to alleged deficiencies in training on de-escalation. *See id.* at 22–28. To the extent Plaintiff relies on her expert, Mark Dunston, to support her claim that the City had inadequate de-escalation training, his opinion and proffered testimony do not salvage the failure-to-train claim. *See id.* at 23. Dunston claims that Officer Godsie's actions in particular exhibited an "escalation response" that was inconsistent with "de-escalation training." Dkt. 36-1 at 3. Dunston also takes issue with "Officer Hughes' shoving." *Id.* at 3–4. Rather, he argues that "[d]e-escalation tactors are designed for this type of encounter." *Id.* at 4. Perhaps. But when pressed at argument, Plaintiff's counsel could identify no training deficiency, save at the broadest level of generality. Plaintiff's counsel stated just that "they would have been trained on how to defuse a situation," and that "Officer Hughes should

have defused the situation instead of – he escalated the situation," and that the officers should have training on "how to address the person that might be escalating." That is little more than saying the officers should have been better trained, which is insufficient. It further appears undisputed that the police department's training had previously incorporated "de-escalation" principles, even if not in a standalone program. *See, e.g.*, Dkt. 30-14("Gillespie Dep.") at 74; Dkt. 54 at 10. And Plaintiff (and Dunston) offer no specifics for how previously given de-escalation training was insufficient. *See Rowell*, 341 F. App'x 912, at *4.

In any event, the Lynchburg Police Department has a detailed use of force policy, which Plaintiff does not appear to otherwise attack besides recounting again the facts of this case, and bare allegations that policies concerning juveniles and de-escalation have been left out. Dkt. 54-2 (LPD use of force policy); Dkt. 50 at 22–29. It incorporates training on reasonableness in the use of force, the standard applying to the use of force against juveniles as well as adults. *See E.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018) (applying *Graham* reasonableness test to use of force claim involving ten-year-old). Lastly, to the extent that Plaintiff argues in the context of her failure to train claim that there was a deficiency in documentation of uses of force, that claim fares no better. Dkt. 50 at 23. The City has presented substantial evidence of documentation policies and procedures. Dkt. 30-17 ("Rhodes Decl.") at 1 (¶ 4) ("all complaints of use of excessive force are investigated by a LPD supervisor with a rank of sergeant or higher who was not involved in the use of force incident …"). Plaintiff has not presented any contrary evidence such as would give rise to a genuine issue of material fact on the point. And, even if she had, the claim could not proceed because any alleged insufficient documentation could not have been the "moving force" behind the alleged constitutional violation. *See City of Canton*, 489 U.S. at 389

(municipality can only be liable "where its policies are the 'moving force' [behind] the constitutional violation").

Because Plaintiff's failure to train *Monell* claim fails for these numerous reasons, the Court will award Defendant City of Lynchburg summary judgment on the claim.

<u>*Monell* Claim – Ratification</u>

Lastly, Plaintiff has raised a *Monell* claim under a ratification theory. Under that theory, when a final policymaker "has the authority to review the decision of a subordinate, its approval of that allegedly unconstitutional decision can also give rise to liability under Section 1983." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 534 (4th Cir. 2022) (citation omitted). That is known as "ratification liability." It "holds municipalities accountable for the actions for which the municipality is actually responsible." *Id.* In other words, it holds the municipality "liable for *its own decision* to uphold the actions of subordinates." *Id.*

Plaintiff argues that "[t]he City has absconded from its duty to supervise and regulate its departments," because, in Plaintiff's words, the Lynchburg Police Department "determines what qualifies as a use of force incident for investigation, which is only when an individual is visibly injured and makes a complaint." Dkt. 50 at 28. She further contends that the City has not taken action against an officer who used excessive force on a citizen. *Id.* Thus, in Plaintiff's view, the City's policy impermissibly "allow[s] the LPD to manage and regulate itself, with no oversight or supervision." *Id.* This argument similarly fails because the Court has held that there was no underlying constitutional violation in this case. Nor has Plaintiff put forward any authority to support her apparent, far-fetched claim that it is constitutionally insufficient to have the City's Chief of Police be primarily responsible for oversight of the police force. Nor does her claim address the role of the City Attorney in receiving use of force investigations. Nor has Plaintiff

34

presented any evidence that the City's ratification of prior similar, unlawful uses of force caused any such unlawful use of force here—and again, there is none. Indeed, Defendants have presented uncontradicted evidence that the City has found sustained multiple use of force complaints in the five preceding years, and all involved officers were disciplined (save one, who resigned). *See* Dkt. 54 at 16; Dkt. 30-17 ("Rodes Decl.") at 2 (¶¶ 6–7).

Plaintiff's *Monell* claim under a ratification theory similarly fails. The Court will award the City of Lynchburg summary judgment on the claim.

<u>Conclusion</u>

For the foregoing reasons, the Court has determined that Defendants are entitled to summary judgment on all of Plaintiff's claims. Accordingly, in an accompanying Order, to follow, the Court will grant Defendants' motion for summary judgment. Dkt. 29. The Court will also deny as moot the other pending motions in *limine*, motions to exclude and pretrial motions. Dkts. 26, 31, 33, 35, 59.[12]

The Clerk of Court is directed to send this Memorandum Opinion to the parties.

Entered this <u>30th</u> day of September, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[12] Indeed, none of these other pending motions—save for a brief discussion of Plaintiff's use of force expert Mark Dunston—factored into the parties' briefs on the summary judgment motion. Nor would any issues raised therein materially alter the Court's disposition of the case.